and under advisement. Thank you. We will go on to case number four of the day. And that is 222911, Robert Dekelaita versus United States, Miss Abraham. Good morning. My name is Christina Abraham and I with my co-counsel Richard Vorak represent the petitioner Robert Dekelaita in the matter before the court. This case is about whether the district court erred in denying relief, habeas relief to the petitioner after an evidentiary hearing uncovered undisclosed immigration assistance and benefits provided to trial witnesses in exchange for their testimony. The trial court was correct in finding that there was no question that the client witnesses had an understanding before, at, and after the time of trial that an insider was available to render assistance. This assistance, the court concluded, was a promise of a benefit and it was undisclosed. The assistance provided to the client witnesses was designed to allow them to remain in the United States against immigration law. And for some of the witnesses, this required government assistance with further immigration fraud. How would the disclosure that Agent Chesla was available to offer the witnesses general assistance have changed Dekelaita's trial strategy without any foreknowledge of what specific form that assistance would take? So, two points to that, Your Honor. First, there was some assistance that was provided pretrial that could have been disclosed. There was an idea of exactly what kind of assistance was intended to be provided. Secondly, as the court itself found, this pretrial agreement and understanding was shared by both the client witnesses and the agents, and so that could have changed Dekelaita's trial strategy because throughout trial, the government emphasized, and I'm sorry, did you have a question for me, Your Honor? Throughout trial, the government emphasized how the trial witnesses had no incentive to lie and, in fact, put themselves at risk for having admitted to the immigration fraud. And we discovered that that, in fact, was absolutely not true. And there was no, the evidence to that, the assistance that was provided to these client witnesses was suppressed to the defense. But to follow up on Judge Rovner's question, how would the way Mr. Dekelaita tried his case have changed? Sequence of witnesses, nature of proof, what about the trial would have been different? What would have been elicited through the testimony of the client witnesses was that they were, in fact, receiving and expected to receive assistance from OIG agents that would allow them to remain in the United States permanently in contravention of immigration law. And that would have allowed Mr. Dekelaita to put forth to the jury that these witnesses were really motivated to protect their immigration status. That was why they were providing the testimony. It goes to their inherent credibility. It goes to the impeachment of the witnesses. It goes to the material assistance that they were provided that was not disclosed. Some of that was done, for example, with client witness Cordova, right? During the trial? Yeah. Some of it was done, but it was denied the entire time. So it rendered our strategy toothless. When they are denying what, in fact, was true, there was nothing, no evidence to contradict what the client witnesses were denying. That actually undermined Dekelaita's ability to put forth that argument at trial. And he would have been correct to do so because that assistance, that understanding did exist and they were denying it the entire time. So let's take- I imagine your clients asking if Chabo Cordova is, quote, still married and telling her, quote, you can go back to Ecuador and wait until your husband becomes a citizen in the recording, prove his knowledge of her fraud regardless of the innocent explanation you give for the other quotes in your brief? No, Your Honor, and what I would say to that is this, that recording does not establish without Chabo Cordova's testimony when Mr. Dekelaita became aware of her marriage to an Ecuadorian citizen. The conspiracy counts, which by the way, if it's just between Chabo Cordova and Mr. Dekelaita, a conspiracy count would not be able to stand because she was a confidential informant. But the conspiracy count and that story about how he knew at the time these asylum filings were made came from Chabo Cordova's testimony, did not come from those recordings. Those recordings were taken six years after the asylum filings. So the jury had to rely on Chabo Cordova and Cordova's testimony. And unbeknownst to them at the time is that they were receiving help from OIG to have Cordova naturalized so that Chabo Cordova, the confidential informant, could receive a green card, which she was not lawfully entitled to because she had falsely claimed to be a U.S. citizen when she had entered the United States before she ever met Mr. Dekelaita and because she had admitted to committing asylum fraud, two things that would bar a person from permanent residency forever with no waiver available. The argument that you're offering, Ms. Abraham, would be the same regardless of whether Judge Connelly had had this lengthy 2255 hearing and the standard review was abuse of discretion. It strikes me that those are two hills you'd have to climb here because, as I understand, I think the 2255 hearing was longer than the criminal trial itself, correct? It was not, no. The criminal trial went for six weeks. Oh, I apologize. No, that's okay. But my question goes to abuse of discretion as a standard review and the lengthy hearing that Judge Connelly had to try to explore these issues. He did, in fact, have a hearing, a lengthy hearing, and he did, in fact, allow for discovery to be conducted into these pretrial assistants. But as elaborated in our briefs, the court misstated the facts and that represents a clear error. So when the court was evaluating the prejudice prong, for example, he concluded that there was evidence that was, quote-unquote, entirely unrelated to the client witnesses that supported the verdict, but that's actually not, in fact, true at all. He cites to an interpreter as a witness that the interpreter, Adam Benjamin, had never testified at the trial. He cites to Alan Tuch, who was an associate that testified at the trial, but Tuch provided no substantive testimony on the conspiracy count. Tuch testified under an immunity deal on primarily the marriage fraud count on which the petitioner was ultimately acquitted. So we can't be confident that Tuch's testimony would have carried the day there either. And then with regard to the recording, again, as a matter of law, a conspiracy with Jabo Cordova alone, because she was a confidential informant, could not stand. Second, the recording itself was not entirely unrelated to the client witness testimony, because as I mentioned, it relied on Jabo Cordova's testimony to provide the context. And then third, the statements in the recordings are vague and they don't convey an admission. So one is petitioner advising Jabo Cordova not to tell immigration officials that someone wrote her story for her because the official could construe that to mean that her claim was not genuine. The other statement regarding her Ecuadorian citizenship doesn't indicate he knew of the facts at the time that the asylum filings were submitted. That required the testimony of Jabo Cordova and Cordova to string together. And finally, can I answer any more questions on that materiality, the prejudice aspect, before I move on to scope? Okay. Finally, the court erred in Suas-Fonte refusing to consider certain evidence as supposedly outside the scope of the habeas petition. This included pretrial assistance to Cordova when Agent Schaudy intervened to help him obtain citizenship. That was pretrial. To Jabo Cordova pretrial when Agent Chesla requested USCIS expeditiously approve the I-130 petition that her husband filed after receiving OIG's help naturalizing. And to Raman Isha when the agents looked the other way as to his spouse's immigration fraud. The trial court's conclusion is both incorrect as a matter of law and inconsistent with its own prior rulings in this case. The trial court admitted this evidence at the evidentiary hearing. With Cordova and Jabo Cordova, this was done with no objection from the government. And with Isha, the evidence was admitted over the objection of the government. And either way, by allowing the evidence into the evidentiary hearing, the court was saying it was within the scope of the habeas petition. And moreover, the evidence did pertain to exactly what the district court identified and articulated was the scope of petitioner's habeas petition early on. Quote, promises and receipts of benefits that were not disclosed to the defense or the jury. End quote. With that, are there any questions about that issue that I can answer for the court in the time? No, and you have, you're using up all of your time. Are there any questions? Presume you'd like to reserve the rest for rebuttal. Yes, I've reserved three minutes for rebuttal as well. Well, I will. I'll give you some time. Okay, thank you. Okay, thank you. All right. Hello. Good morning, Judge. May it please the court. Georgia Alexakis, representing the United States. The district court properly denied the defendant's 2255 motion. This district court presided over, I have it down as a 12-day trial, Judge Brennan, and a seven-day post-conviction evidentiary hearing. The court found that the government failed to disclose a particular benefit, namely an understanding that agents would try to help client witnesses post-trial with respect to their immigration prospects, but with no guarantee as to the outcome of that assistance. And the court found that this disclosure . . . How do you explain the various witnesses' shared willingness to reach out to Agent Cheslett for immigration matters, big and small, if they testified truthfully that they did not even have an understanding that he might help them? Sure, Judge. I mean, the district court here found that there was such an understanding. I think the government has noted in its brief that it disagrees with that conclusion. Right. And I think the evidence from the hearing supports, in the government's view, a more reasonable inference that there had been a rapport that had been established between the agents and the witnesses that allowed the witnesses to feel as if they could reach out to the agents. But evidence of such a rapport is not the equivalent, or evidence of an expectation is not equivalent to evidence of an agreement, would be the government's position. But even taking the district court's finding that, in fact, there was a benefit, that this benefit wasn't disclosed, the government believes that the district court did not err in finding that that evidence of that undisclosed benefit would not have had a material effect on the jury's determination here. And given the fact that the district court saw the full weight and the credibility of the government's case, it was more than qualified to make that determination. We have recordings that were admitted here at trial that were untethered to the undisclosed benefit. They show that the defendant's interpreter and co-conspirator, Adam Benjamin, provided false translations, that the defendant knew this as early as 2010 or 2011, and that the defendant continued to employ the interpreter anyway. And this comes from the Benjamin recording and the Tesh testimony. And regardless of what defense counsel may want to say about Tesh testifying pursuant to immunity, the claim here on 2255 was with respect to undisclosed immigration benefits. And that's a different claim that defense counsel is making unconnected to the undisclosed benefit. The jury also heard that the defendant directed Mr. Tesh to fabricate an affidavit, which was alleged to be a particular overt act in furtherance of the conspiracy. So contrary to defense counsel's representation, this type of evidence did bear directly on the conspiracy count on which Mr. DeColaita was convicted. And the recordings and testimony also captured the defendant specifically telling Jabo Cordova to conceal her Ecuadorian passport, to, quote, stick to the same story, to obtain a fake affidavit from her church in support of her asylum affidavit. In this recording, these statements were clear as day. They did not require interpretation from Ms. Jabo Cordova. They didn't require her to supply additional context. They clearly corroborated her prior testimony. With respect to defense counsel's representation, that her client's trial strategy would have been different, substantially different, based on this undisclosed benefit. That simply, that is not a credible claim in light of what the jury did hear about the post-trial immigration prospects of the client witnesses. They heard evidence, the jurors heard evidence of those prospects that was, in a manner that was consistent with the undisclosed benefit of post-trial aid. The jurors heard that no promises had been made that client witnesses could remain. That is precisely what the district court found after the 2255 evidentiary hearing. Defendant does not challenge that finding. The jurors heard that these client witnesses had stayed in the United States for quite some time, even after the government learned of the fraud. We have client witnesses here who secured asylum and legal status well before the 2010 investigation began. And clearly by 2016, we're still testifying at trial that they had that status. We have three client witnesses testify that the government had specifically told them that post-trial, quote, no change in status was an option. Meaning the status quo, remaining in the United States was an option. Those same three witnesses testified that the government had told them that alerting citizenship and immigration services of their cooperation was another option. The jurors heard that client witnesses expected to remain in the United States. And then in fact, one client witness, Jabo Cordova, did remain in the United States even after her deferred action expired. Defense counsel argued strongly during closing that the government was responsible for that non-removal. And that is a reasonable inference for the jury to make where again, as defense counsel pointed out, when it comes to immigration, the government is quote, the only game in town. So the jury heard at the end of the day, they heard evidence of the client witnesses post-trial immigration prospects that was entirely consistent with the undisclosed benefit of this mutual understanding that an insider would be available. And it makes it difficult, if not impossible for defendant then to credibly claim that his trial strategy would have been substantially different in such a way that the district court could reasonably conclude that a different verdict, a different outcome could have been reached. And that is also particularly true where the district court emphasized in denying the 2255 that these client witnesses were vigorously impeached by the defendant based on their past frauds. They were called liars. They were called perjurers. The jury heard time and again that they had committed fraud on their own in other instances without Mr. Decalite's assistance. And so again, the district court did not err in concluding that any additional impeachment with respect to what the district court described as not an actual tangible benefit, but rather a mere offer of assistance. None of that would have changed the result here. I believe that defense counsel argue that the district court improperly applied the materiality standard by focusing on evidence separate and apart from the client witnesses testimony and credibility to reach its conclusion with respect to the 2255 motion. And to just touch on that briefly, I'll say that the district court articulated the proper materiality standard in considering the recordings and the testimony that was untethered or untainted by the undisclosed benefit. The district court was properly looking, was properly complying with case law that directs it to consider untainted evidence. The case law that says that untainted evidence must not be ignored in this type of analysis. Now it needs to be considered as part of the record as a whole, but that's exactly what the district court did here, looking at again, how the client witnesses credibility was otherwise attacked and also considering what other evidence the jury heard with respect to the client witnesses immigration prospects post-trial. Finally, I'd like to use the remainder of my time to address the claims that the district court ultimately found to be outside the scope of the original 2255 motion. From the government's position, the original claim brought by the defendant was very much focused on post-trial retention of immigration status. That's what the habeas petition focused on, that the benefit was to quote, keep the immigration status, that's at docket one, pages four through five. The district court consistent with that pleading, construed the 2255 motion as focused on benefits to client witnesses that could not have been learned without quote, the passage of time. Meaning the emphasis would be on the ongoing, the prospective non-removal of the client witnesses from the United States. The other claims that the district court ultimately found to be outside the scope of the 2255 did not involve post-trial assistance. It involved Mr. Cordova's naturalization application, something that was done in 2013. It involved Jabo Cordova's I-130, again, a pretrial activity. It involved an allegation about Dahlia Kajbu's fraud conviction. Well, Dahlia Kajbu's not a client witness, not a witness, there are no disclosure obligations, unclear how a fraud conviction of hers could be used to impeach one of her clients. And with respect to Esho, again, Esho's wife, not a client of Mr. Decolitis, not a witness at trial, and any fraud that may have been committed by Ms. Esho would have been done pretrial and there's no indication as to how any fraud committed by the wife could have been imputed to Mr. Esho himself. But regardless of the individual facts, at the end of the day, what the district court found incorrectly is that none of these out-of-scope claims, how I'll refer to them in shorthand, could have had a material effect on the outcome of the trial. And with respect to Mr. Cordova and Ms. Jabo Cordova in particular, that's especially true where the jury heard that Ms. Jabo Cordova had remained in the United States, had received work authorization because of her cooperation, expected to remain in the United States, and indeed continued to remain in the United States even after her deferred action status expired in the middle of trial. If there are no questions from the panel, I would ask that the court, that this court affirm the district court's judgment. Thank you. Thank you very much. Ms. Abraham, I will give you your three minutes. Thank you. Although you used them up. So I only tell you that because it really is important to, you know, watch that clock. Oh, I'm terribly sorry. I thought I started with seven minutes on the clock.     I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I apologize for that. Thank you for giving me the additional three. No, no, no, no, go ahead. Just go ahead. Were there any questions that I can answer from the court before I get into my points on rebuttal? No, why don't, oh, sorry. I'm sorry. Go ahead, Judge Roper. No, no, no. Go ahead, please. Your response on the abuse of discretion standard review was to point to certain clear errors. Do you have any other response with regard to the fact that Judge Connelly here heard from witnesses, allowed evidence to be taken before he reached his conclusions with regard to what impact further impeachment might have had on the verdict? Yes, I do. I have some points to raise. So first of all, the observation that Jabo Cordoba testified that she was already here, she was here on deferred action. Deferred action, as the court probably already knows,  which is what she received after the trial through further immigration fraud with the help of the OIG agents. I think that is significant. I think the jury would understand that there are people who would risk and do risk every day significant dangers just to be here, to come to the United States, to live here permanently, to be able to work here with illegal immigration status. And so for them to be told, hey, that's not what's happening here, I think was outright deceptive because in fact, what we learned after trial, that it wasn't just about them being allowed to temporarily remain while the investigation was ongoing, it's about them being able to continue to live their lives in the United States despite their admitted immigration fraud and in contravention of the law. That's something the jury and the defense should have known. And it's something we tried to get at, but we were thwarted because we were consistently told that that was not the case when in fact it was. So all of the client witnesses clearly, clearly understood that they could reach out to OIG agents when they were in times of trouble. So for example, when Sabah Musa was arrested in 2017 by ICE during mass roundups, the first thing the family did was reach out to Agent Chesla and Agent Chesla by misinforming the ICE officer was able to get Musa released. He did not tell the ICE officer about Musa's admitted fraud. He was wrongly arrested. No, in fact, he was correctly arrested, Your Honor, because as the immigration officer, as the ICE officer himself contested, had he known about the immigration fraud, he would have put him in removal proceedings to have his withholding of removal removed.  And Judge Cannella agree with that assessment? I believe he ultimately did. But then my understanding of Judge Cannella's assessment was that this didn't prejudice him because of the other evidence that was, quote unquote, entirely unrelated. And I see my time is up. I thank the court for your time and consideration. Thank you very much to both counsel and the case, of course, will be taken under advisement. Thank you.